IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

WILLIAM H. CONNOR,

          CIVIL NO. 2:14-CV-00626
 Petitioner,       CRIMINAL NO. 2:10-CR-332
          JUDGE GREGORY L. FROST
 v.          Magistrate Judge Elizabeth P. Deavers

UNITED STATES OF AMERICA,

 Respondent.

ORDER and
REPORT AND RECOMMENDATION

   Petitioner, a federal prisoner, brings the instant motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.  This matter is before the Court on the *Motion* and *Memorandum in Support,* ECF No.  137, 143; Respondent's *Answer* and *Supplemental Answer in Opposition*, ECF No.  142, 147; Petitioner's *Reply,* ECF No.  148; and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the Motion be **DENIED** and this action be **DISMISSED**.

   Petitioner's request for an evidentiary hearing and the appointment of counsel are **DENIED.**

**Procedural History**

   A jury convicted William Conner of four counts of receipt of visual depictions of child pornography and one count of possession of child pornography.  The Court entered judgment and sentenced him to 360 months in prison.  ECF No. 116, 117.  On April 11, 2013, the United States Court of Appeals for the Sixth Circuit affirmed the judgment of this Court.  ECF No. 135.

   On June 26, 2014, Petitioner filed the instant motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.  He asserts that he was denied a fair trial because he was

clothed in jail garb and visibly shackled during trial; that his convictions on four counts of receipt of visual depictions of child pornography violate the Double Jeopardy Clause; and that he was denied the effective assistance of counsel based on his attorneys' failure to object to prosecutorial misconduct and the search of his home.  It is the position of the Respondent that Petitioner has procedurally defaulted his claims and that they are without merit.

**Standard of Review**

To obtain relief under 28 U.S.C. § 2255, a defendant must establish the denial of a substantive right or defect in the trial that is inconsistent with the rudimentary demands of fair procedure. *United States v. Timmreck*, 441 U.S. 780 (1979); *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (*per curiam*).  Relief under 28 U.S.C. § 2255 is available when a federal court imposes a sentence in violation of the Constitution or laws of the United States or the trial court was without jurisdiction or the sentence is in excess of the maximum sentence allowed by law, or is "otherwise subject to collateral attack." *United States v. Jalili,* 925 F.2d 889, 893 (6th Cir. 1991).  Apart from constitutional error, the question is "whether the claimed error was a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *Davis v. United States*, 417 U.S. 333, 346 (1974)(quoting *Hill v. United States*, 368 U.S. 424, 428–429 (1962); *see also Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2006).  Claims of a non-constitutional dimension that are not raised at trial or on direct appeal are waived for collateral review except where the errors amount to something akin to a denial of due process.

It is well-established that a § 2255 motion "is not a substitute for a direct appeal." *Ray v. United States,* 721 F.3d 758, 761 (6th Cir. 2013) (quoting *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (citing *United States v. Frady*, 456 U.S. 152, 167–68 (1982)).  Accordingly, claims that could have been raised on direct appeal, but were not, will not be

entertained via a motion under § 2255 unless the petitioner shows cause and actual prejudice to excuse his failure to raise the claims on direct appeal or that he is "actually innocent" of the crime.  *Ray*, 721 F.3d at 761 (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal citations omitted)).  "To obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  *Frady*, 456 U.S. at 166.

**Ineffective Assistance of Trial Counsel**

Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to object to prosecutorial misconduct and failed to properly argue the motion to suppress evidence.  To the extent that Petitioner was represented by counsel at the time of the filing of the motion to suppress evidence, the Court will consider that issue below.  The former claim, however, is waived because Petitioner elected to exercise the right of self-representation. The United States Supreme Court noted in *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975), that "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of the effective assistance of counsel."  *See also McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984); *United States v. McDowell*, 814 F.2d 245, 251 (6th Cir. 1987); *Lawton v. Ludwick*, No. 2:10-cv-10048, 2015 WL 400788, at *6 (E.D. Mich. Jan. 28, 2015).

Petitioner argues, however, that he did not knowingly and intelligently relinquish his right to counsel.  *Reply,* ECF No. 148, PageID# 1608-09.  The Court first turns to this issue.

**Right to Self-Representation**

"The Sixth and Fourteenth Amendments of our Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of

counsel[.]"  *Faretta*, 422 U.S. at 807.  The government, however, cannot force an attorney to represent a criminal defendant who wants to conduct his own defense.  *Id.*

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly.  To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal.  The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."

*Id.* at 834 (quoting *Illinois v. Allen*, 397 U.S. 337, 350-351 (1970) (Brennan, J., concurring) (footnote omitted).  Because an accused who chooses the right of self-representation thereby relinquishes many of the benefits associated with the right to counsel, he must knowingly and intelligently waive the right to counsel.  *Id.* at 835.  "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

The Supreme Court's analysis in *Faretta* is instructive.  There, the Supreme Court noted that Faretta had knowingly and intelligently waived his right to counsel where, "weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel."  The record showed that Faretta was literate, competent and

4

understanding, and was voluntarily exercising his informed free will.  The trial court warned Faretta that it thought it was a mistake and that Faretta would be required to follow the rules of procedure.  *Id*.  Such are the circumstances here.

The Court appointed the Office of Federal Public Defender to represent Petitioner.  In February 2011, Petitioner requested the appointment of new counsel referring to a break-down in the attorney-client relationship.  ECF Nos. 28, 29.  Petitioner complained that his attorney, the Federal Public Defender Steven Nolder, "insisted" that he plead guilty and urged Petitioner to view a VHS tape depicting child pornography that would be submitted as evidence against him. *Reply*, ECF No. 148, PageID# 1608.  The Court granted Petitioner's request for new counsel and appointed Kort Gatterdam[1] on Petitioner's behalf.  ECF No. 36.  Thereafter, on August 18, 2011, shortly before the scheduled trial date of August 29, 2011, Petitioner requested that he be permitted to proceed *pro se*.  *Transcript,* August 18, 2011, ECF No. 124.  He indicated that he was not happy with the representation of counsel.   He represented to the Court that he did not agree with counsel's advice or assessment that Petitioner's chances of acquittal looked grim. PageID# 1554-55; 1557; 1562.  The Court, however, suggested that Petitioner "listen carefully" to his attorneys, who had much more courtroom experience.  Petitioner understood, but declined representation by counsel.  PageID# 1559.  The Court informed Petitioner that his alternative would be to represent himself.  *Id*.  Petitioner wanted to hire an attorney, but did not have the funds.  *Id*.; 1566-68.  Petitioner acknowledged, in response to the Court's questioning, that he had never studied the law and had no trial experience, aside from a minor traffic violation. PageID# 1559-60.  Petitioner understood the serious nature of the charges against him, and that he faced a mandatory minimum term of five to twenty years on four of the charges against him.

---

[1]  Erik Henry, an attorney with Mr. Gatterdam's firm, also represented Petitioner.

PageID# 1560-62.  Petitioner did not agree with the plea offer.  PageID# 1563-64.  He had reviewed the potential application of the advisory sentencing guidelines with counsel.  PageID# 1564-65.  Petitioner understood that if he attempted to represent himself he would be completely on his own, and the Court would be unable to assist him.  PageID# 1565.  Petitioner acknowledged that he had no familiarity with the Federal Rules of Evidence or Rules of Criminal Procedure and that he nonetheless would be bound by those rules.  PageID# 1565-66.  The Court warned Petitioner of the dangers of self-representation, and repeatedly cautioned him that path.

> Mr. Connor, I must advise you that in my opinion, a trained lawyer could defend you far better than you defend yourself – far better.
>
> ***
>
> I think it is unwise for you to try to represent yourself in this matter.
>
> ***
>
> You are not familiar with the law, as you have told me.  You are not familiar with the Rules of Evidence, as you have told me.  You are not familiar with the Rules of Procedure, as you have told me, and I strongly urge you not to try to represent yourself in this matter.

PageID# 1566.  The Court informed Petitioner that his attorney was experienced and competent, "what I consider to be one of the best attorneys, whether the attorney is hired or appointed[.]"  PageID# 1567-68.  After being provided a recess to discuss the matter with counsel, however, Petitioner refused representation by counsel.  PageID# 1569.  He again stated that he wanted to represent himself, despite the Court's repeated admonitions against doing so.  PageID# 1569-70.  Petitioner admitted that no one had coerced him into the decision.  PageID# 1571.  After a lengthy discussion, the Court found that Petitioner had knowingly and voluntarily waived his

right to counsel.  *Id*.  Petitioner refused the appointment of stand-by counsel.  PageID# 1571-72.

The Court again warned Petitioner against exercising the right of self-representation.

> COURT:  I am trying to advise you not to do this; do you understand that?
>
> PETITIONER:  Yes.
>
> COURT:  You don't want to take my advice?
>
> PETITIONER:  No, because I am still going to get the same amount of time[.]
>
> ***
>
> COURT:  I am not in the position to beg you, and I am not going to.  It is up to you.

PageID# 1573.

On August 29, 2011, after the government's opening statement, Petitioner stated that he had changed his mind.  ECF No. 127, PageID# 955.  "I would like to have my attorney back.  I didn't think it was going to be this complicated[.]"  *Id*.  The Court denied Petitioner's request. "You can't stop the proceedings in the middle of it and try to say now that you wish to have an attorney.  It's too late."  PageID# 957.   The Court, however, arranged for and appointed stand-by counsel in less than two hours of Petitioner's request.  PageID# 962.

Although a defendant's decision to exercise his right to self-representation is not "a choice cast in stone," the right to counsel—once waived—is no longer absolute, and may be denied where further delays would prejudice court, the parties, or the witnesses.  *McCormick v. Adams*, No. CIVS-05-0735 JAM GGH, 2008 WL 2561101, at *12 (E.D. Cal. June 24, 2008)(citing *Menefield v. Borg*, 881 F.2d 696, 700 (9th Cir. 1989)).  "There are times when the criminal justice system would be poorly served by allowing the defendant to reverse his course at the last minute and insist upon representation by counsel."  *Menefield,* 881 F.2d at 700 (citing

*United States v. Studley*, 783 F.2d 934, 938 (9th Cir. 1986); *United States v. Leavitt*, 608 F.2d 1290, 1293 (9th Cir. 1979)).  "The right of self- representation is not a license to abuse the dignity of the courtroom."  *Faretta*, 422 U.S. at 834 n.46.

> The right to defend pro se and the right to counsel have been aptly described as "two faces of the same coin," *United States v. Plattner*, 330 F.2d 271, 276 (2d Cir. 1964), in that the waiver of one right constitutes a correlative assertion of the other. While it may be within the discretion of a District Court to permit both a criminal defendant and his attorney to conduct different phases of the defense in a criminal trial, . . . for purposes of determining whether there has been a deprivation of constitutional rights a criminal defendant cannot logically waive or assert both rights. The defendant must make a choice, and he should not be permitted to manipulate his choice so that he can claim reversible error on appeal no matter which alternative he apparently chose in the District Court. . . .

*United States v. Condor,* 423 F.2d 904, 907-08 (6th Cir. 1970)(citations omitted).

Here, after being well advised of the dangers and pitfalls of self-representation, the seriousness of the charges and potential sentence he faced, Petitioner knowingly and intelligently, with eyes wide open, chose to exercise his right to self-representation.  *Faretta*, 422 U.S. at 835.  The Court repeatedly warned Petitioner against exercising his right to self-representation, and urged him to reconsider the decision prior to trial.  As an indigent defendant, Petitioner does not have a Sixth Amendment right to be represented by his counsel of choice. *Bullock v. Jackson*, No. 1:07-cv-392, 2008 WL 4921355, at *6 (S.D. Ohio Aug. 26, 2008)(citing *Wilson v. Parker*, 515 F.3d 682, 696 (6th Cir. 2008) (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989); *Morris v. Slappy*, 461 U.S. 1, 14 (1983)); *see also Daniels v. Lafler*, 501 F.3d 735, 739 (6th Cir. 2007)(same).  Petitioner had explicitly rejected the services of three attorneys.  He waited until after the jury had been selected and the Prosecutor made his opening statement to say that he had changed his mind.  Although the Court rejected

Petitioner's demand for an attorney, the Court appointed stand-by counsel who joined Petitioner in the courtroom within minutes of his request.  Petitioner's attempted revocation of his decision to represent himself mid-trial does not undermine the fact that he knowingly and intelligently waived his right to counsel.  Therefore, he cannot now claim the denial of the effective assistance of counsel in this regard.

**Procedural Default**

Petitioner asserts that he was denied a fair trial because he was clothed in jail garb and visibly shackled during trial.  He also maintains that the charges against him were multiplicitous and therefore violate the Double Jeopardy Clause.  Petitioner has waived these claims by failing to raise them on appeal.  Thus, these claims are procedurally defaulted.   Petitioner therefore must establish cause and prejudice to obtain review of these claims.  *See Murray v. Carrier*, 477 U.S. 478, 485 (1986) ("A federal habeas petitioner who fails to raise claims on direct appeal is required to demonstrate both cause and prejudice to excuse procedural default."); *Massaro,* 538 U.S. 500, 504 (2003)(citing *United States v. Frady*, 456 U.S. at 167-68)).  As cause for his procedural default, Petitioner asserts the denial of the effective assistance of appellate counsel. He argues that his appellate counsel should have raised these issues on appeal.

**Ineffective Assistance of Appellate Counsel**

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  "Only a right to 'effective assistance of counsel' serves the guarantee."  *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted).  The United States Supreme Court set forth the legal principals governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* requires a petitioner claiming ineffective assistance of counsel to demonstrate

that his counsel's performance was deficient and that he suffered prejudice as a result.  466 U.S. at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013).  A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below and objective standard of reasonableness."  *Poole v. MacLaren*, No. 12–1705, 547 F. App'x 749, 2013 WL 6284355, at *5 (6th Cir. Dec. 5, 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted) and citing *Strickland*, 466 U.S. at 687)).  To make such a showing, a petitioner "must overcome the 'strong [ ] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Poole*, 2013 WL 6284355 at *5 (quoting *Strickland*, 466 U.S. at 687).  "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

    The *Strickland* test applies to appellate counsel.  *Burger v. Kemp*, 483 U.S. 776 (1987).  Counsel must provide reasonable professional judgment in presenting the appeal.  *Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985).  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes,* 463 U.S. 745, 751–52 (1983)).  The Court must assess the strength of the claim appellate counsel failed to raise.  *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008).  "[P]rejudice is shown if there is a reasonable probability that, but for his counsel's failings, the defendant would have prevailed on his appeal."  *Simmons v. Howes*, No. 1:09-cv-708, 2012 WL 4372889, at *5 (W.D. Mich. Aug. 21, 2012)(citing *Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir. 2009 (internal citation omitted)).  "Counsel's failure to raise an issue on appeal could only be

ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004)(citation omitted).

Petitioner's assertion that his appellate counsel was ineffective for failing to assert these issues on appeal clearly lacks merit.  Petitioner agreed to be visibly shackled and handcuffed during trial.  Further, the Court provided him the opportunity to appear in the clothing of his choice.  On August 25, 2011, at the pre-trial conference, the Court asked Petitioner whether he intended to wear jail garb or street clothes during trial. ECF No. 141, PageID# 1440.  Petitioner acknowledged that his attorney had advised him against appearing before the jury in his jail clothing.  Petitioner, however, declined to accept this advice and questioned why he should "lie" to the jury.  "I don't feel that I should be lying to the jury by coming in here being false pretense like I ain't arrested."  *Id.*  The Court told Petitioner to decide what he wanted to do so that he could make arrangements for clothes to be available.  PageID# 1441.  On the first day of trial, Petitioner indicated that his sister had provided street clothes for him to wear but that they were at the Franklin County Jail.  The Court provided a thirty minute recess so that the Marshals could obtain the clothing.  ECF No. 127, PageID# 924-26.

Petitioner's assertions regarding the physical restraints he wore during the trial likewise are unavailing.  At the final pretrial conference, the Court advised Petitioner that the United States Marshal's Office intended to use an electronic restraint device (stun belt) throughout the duration of the trial.  PageID# 1442.  The Court explained to Petitioner that, to accommodate Petitioner's self-representation, his shackles and handcuffs would be removed, but a stun belt would be placed around his belt area underneath his clothes where it would not be visible to the jury.  PageID# 1443.  If, however, Petitioner acted in a threatening manner, the Marshals would

activate the stun belt.  PageID# 1443-44.  Petitioner indicated that he understood and that it did

not matter to him.  *Id.*  He was "fine" with the use of handcuffs and shackles.  "I'm comfortable

in these one way or the other.  I can wear these."  PageID# 1450.

> COURT:  What I'm trying to say is this:  When you appear in court in jail clothes and in physical restraints that are visible, it might give the wrong impression to the jury –
>
> ***
>
> Because. . . you're innocent until proven guilty.  So, that's why we are trying – we are taking these steps.
>
> One of the reasons we're trying to take these steps is to allow you some freedom in the courtroom but to ensure us that everything can remain safe.  So, unless you have some objection, I'm going to go ahead and order the stun belt, or electronic restraint device, to be employed.
>
> PETITIONER:  And I reject on it, then. . . . I don't want to wear it.
>
> ***
>
> COURT:  Are you suggesting to me that you would rather be handcuffed and shackled during the trial?
>
> PETITIONER: Sure.  Yeah.  No problem.
>
> COURT:  Why?
>
> PETITIONER:  It's just the way I feel.
>
> COURT:  I've just explained to you why that would not be a good idea.
>
> PETITIONER:  I know.
>
> COURT:  You're not willing to accept my explanation or to accept –
>
> PETITIONER:  No. . . it's just that, if that's the reason why they're claiming that I need this, it might help their witnesses to feel more comfortable and at home.  So, whatever they want, I give – I mean, I ain't going to argue, fight, or nothing.

***

But I did object to the belt.

***

I'll wear these.  This is fine.  I feel comfortable.

COURT:  I don't think that's a smart idea on your behalf.

PageID# 1452-53.  Petitioner reiterated that he wanted to wear handcuffs and shackles, and the Court took the matter under advisement.

Petitioner now claims that he only chose to appear in handcuffs and shackles because he felt he had no choice.  He now contends that he was afraid of wearing a stun belt due to a heart condition.  Reply, ECF No. 148, PageID# 1606.  Petitioner made the same assertion on the first day of trial.  ECF No. 127, PageID# 927.  He indicated again at that time that he understood he had the right to the use of a stun belt but nevertheless declined to exercise that right.  PageID# 928.

The record fails to support Petitioner's claim that he had no choice but to proceed to trial wearing handcuffs and shackles.  The Court plainly informed Petitioner that the stun belt would only be used if Petitioner acted disruptively.   Petitioner nonetheless chose not to avail himself of this alternative means of maintaining courtroom security.   The Court urged Petitioner to reconsider his decision, and provided him with the opportunity to wear the clothing of his choice at trial with the belt beneath his shirt and out of view of the jury.  Petitioner now asserts that the Court lacked grounds on which to justify the use of restraints.  *Reply,* ECF No. 148, PageID# 1611.  Even if that argument had merit, again, the Court need not address this issue as it pertains to ineffective assistance because Petitioner knowingly exercised the right to self-representation.  Petitioner plainly agreed to wear shackles and handcuffs at trial.   Further, the record

13

demonstrates that Petitioner was not otherwise impeded in his ability to present his defense. Petitioner cannot now complain of an alleged error he created on his own behalf.

> The doctrine of "invited error" is a branch of the doctrine of waiver in which courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside. *Harvis v. Roadway Express, Inc.,* 923 F.2d 59, 61 (6th Cir. 1991). When a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error. *See Leverett v. Spears*, 877 F.2d 921, 924 (11th Cir. 1989); *Draughn v. Jabe,* 803 F. Supp. 70, 75 (E.D. Mich. 1992).

*Fields v. Bagley*, 275 F.3d 478, 485-86 (6th Cir. 2001). For all of the foregoing reasons, Petitioner has failed to establish the denial of the effective assistance of appellate counsel based on his attorney's failure to raise these issues on appeal. Consequently, he has procedurally defaulted these claims.

Petitioner asserts that appellate counsel in a constitutionally ineffective manner by failing to raise an issue that the *Superseding Indictment* was multiplicitous and that his convictions on four counts of receipt of visual depictions of child pornography violate the Double Jeopardy Clause. This claim plainly lacks merit.

"An indictment is multiplicitious if it charges a single offense in more than one count." *United States v. Schaffner*, 715 F.2d 1099, 1102 (6th Cir. 1983) (citing *United States v. Robinson*, 651 F.2d 1188, 1194 (6th Cir. 1981)). "A multiplicitous indictment violates Double Jeopardy by subjecting the Defendant to punishment for the same crime more than once." *United States v. Adkins*, Nos. 5:03-cr-102, 6:08-cv-7033, 2012 WL 1068762, *9 (E.D. Ky. Feb. 22, 2012)( citing *United States v. Menichino*, Nos. 93-1674, 93-1675, 32 F.3d 569, at *2 (6th Cir. July 20, 1994)(unpublished)). Different depictions of child pornography downloaded on different days, however, do not involve a single act or transaction and therefore do not implicate double jeopardy concerns. *Id*. (citing *United States v. Huber*, 414 F. App'x 826, 827 (6th Cir.

2011)); *see also United States v. Starr*, No. 5:04-091-DCR, 2013 WL 1644867, at *5 (E.D. Ky. April 16, 2013)(possession of multiple, distinct images of child pornography supports separate charges regardless of the date the images are downloaded); *United States v. Richards*, 659 F.3d 527, 549 n.13 (6th Cir. 2011)(citing *United States v. Esch*, 832 F.2d 531, 541–42 (10th Cir.1987)(each sexually explicit photograph of children amounted to a separate and distinct sexual exploitation. . . and, therefore, an indictment charging separate counts for each photograph was not multiplicitous, even though the photos depicted the same children and were produced in the same photo session)).

Here, the *Superseding Indictment* charged Petitioner with four counts of the receipt of visual depiction of child pornography in violation of 18 U.S.C. § 2252(a)(2), (b)(1). *Superseding Indictment*, ECF No. 77, Counts 1-4. The charges involved four separate acts, alleged to have occurred on four separate dates, May 9, 2009, March 31, 2010, April 3, 2010, and April 7, 2010, respectively, and involved four separate images. The charge on possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), involved Petitioner's alleged possession, on November 5, 2010, of a VHS video tape. PageID# 428. Thus, the charges do not involve the same pornographic material or contain the same underlying acts. As such, the charges do not concern a single act or transaction and are not constitutionally prohibited by the Double Jeopardy Clause. Petitioner has failed to establish that his appellate counsel performed ineffectively for failing to raise this claim on appeal.

**Motion to Suppress Evidence**

Petitioner argues at length that his attorneys performed in a constitutionally ineffective manner in regard to the filing of a motion to suppress evidence. *Memorandum in Support*, ECF No. 143, PageID# 1532-40. Defense counsel filed a motion to suppress evidence for which the

Court held a hearing.  ECF Nos.  47, 60, 61, 72, 73.   That the Court denied the matter does not

constitute the constitutionally ineffective assistance of counsel.  Furthermore, appellate counsel

raised the issue on appeal.  The United States Court of Appeals for the Sixth Circuit affirmed the

Court's denial of Petitioner's motion to suppress evidence, concluding that Petitioner had no

reasonable expectation of privacy in the peer-to-peer file sharing service:

> Conner argues on appeal that the district court erred by concluding
> that he did not have a reasonable expectation of privacy in files he
> made publicly available on the LimeWire "peer-to-peer" file-
> sharing service and finding that Conner's crimes "involved . . .
> distribution" under the Sentencing Guidelines because of his use of
> LimeWire.  For the following reasons, we affirm the district court's
> judgment.
>
> LimeWire is a computer file-sharing program that any user could
> download for free over the Internet at the time the events in this
> case took place. As the Ninth Circuit recently explained,
>
> LimeWire and similar programs connect network participants
> directly and allow them to download files from one another. To
> download a file, a LimeWire user opens the application and inputs
> a search term. LimeWire then displays a list of files that match the
> search terms and that are available for download from other
> LimeWire users. When a user downloads a file using the
> LimeWire network, he or she causes a digital copy of a file on
> another user's computer to be transferred to his or her own
> computer.
>
> *United States v. Flyer*, 633 F.3d 911, 913 (9th Cir. 2011) (citation
> omitted). This ability to download a file directly from another
> user's personal computer is known as "peer-to-peer" file sharing.
>
> By default, LimeWire stores downloaded files in a "shared" folder
> that is searchable by other LimeWire users. The user can change
> this default setting or manually move files out of the "shared"
> folder if he does not wish to share files. LimeWire users can also
> view the internet protocol ("IP") address of the computer from
> which they are downloading files. The IP address is a unique
> identifier assigned by an Internet service provider ("ISP") to a
> subscriber that can be used to determine the physical location of
> the subscriber if cross-referenced with the ISP's records. In
> addition, each installation of LimeWire is assigned a global unique

identifier number ("GUID") that other LimeWire users can view. If one household has multiple computers that have installed LimeWire, the GUID can be used to determine which computer in the household is sharing a particular file.

Marcus Penwell, a Franklin County Sheriff's Department deputy and a member of the county's multi-jurisdictional Crimes Against Children Task Force, used LimeWire on a daily basis to monitor child pornography possession and distribution. His work computer had a modified version of LimeWire that automatically searched for files bearing names associated with child pornography, but the modified software did not provide him with greater access to the files of LimeWire users than a standard user would have. On September 12, 2010, Penwell identified a computer connected to LimeWire that was making "hundreds of files with titles indicative of child pornography" available for download. Penwell connected to the computer, downloaded some of the files, and found that they contained child pornography. He recorded the IP address and GUID of the computer in question and sent a subpoena to Insight Communications ("Insight"), the ISP that issued the IP address, to determine the location of the computer sharing the files. Insight provided Penwell with the address of Bobby Lawwell. Penwell successfully accessed files from this computer a second time on October 24, 2010, and obtained a warrant to search Lawwell's home based on the files and the information provided by Insight on November 4.

When Penwell and a team of sheriff's deputies arrived at the residence to execute the warrant on November 5, Lawwell met them at the front door of the house.  She explained that she lived in the house with her children, and that Conner, her uncle, lived in an apartment in the garage at the rear of the residence.  The deputies found Conner in the garage apartment, and he permitted them to walk through it to perform a protective sweep. They observed a desktop computer and monitor in the apartment. While other deputies stayed at the residence, Penwell obtained a second warrant to search the apartment due to concern that the separate residence would not be covered by the initial warrant. Penwell returned to the house later that day to execute the new search warrant.

Deputies retrieved Conner's computer and numerous compact disks from the apartment. A forensic search of these items revealed numerous child pornography images. The forensic examination also indicated that the day before the deputies executed the search warrant, Conner reinstalled the operating system on his computer.

17

This process confined the child pornography files to "unallocated" space on the computer's hard drive that is inaccessible to most users, although this space can be accessed with advanced computer forensic tools used by criminal investigators.  The examination also confirmed that Conner had been using LimeWire to obtain and share child pornography. The file paths of many of the images found on the computer indicated that Conner downloaded them from LimeWire and that they were stored in folders searchable by other LimeWire users. In addition, the GUID of the version of LimeWire installed on the computer matched the GUID of the computer from which Penwell downloaded child pornography.

Lawwell also told the deputies that Conner's daughter and ex-girlfriend had accused him of sexual molestation.  Penwell arranged to meet with the two women on November 11, 2010. The daughter told Penwell that Conner had repeatedly raped her between the ages of five and nine years old and had made a pornographic video of her using a VHS video camera when she was six years old.  Penwell again contacted Lawwell, and Lawwell confirmed that Conner had VHS recording equipment and tapes in his apartment. Penwell obtained another search warrant, and sheriff's deputies seized a cache of VHS tapes in Conner's apartment.  Among the tapes seized was a pornographic video of Conner's daughter that matched the description she gave to Penwell.

The government charged Conner with four counts of receipt of visual depictions of child pornography, 18 U.S.C. § 2252(a)(2), (b)(1), and one count of possession of child pornography, 18 U.S.C. § 2252(a)(4)(B). The visual-depictions counts related to images Conner downloaded from LimeWire, while the possession count addressed the video Conner made of his daughter. Conner made numerous pre-trial motions, but the only motion relevant to this appeal is his motion to suppress evidence. He argued that Penwell's use of LimeWire constituted an unlawful, warrantless "search" under the Fourth Amendment and that the court should suppress all evidence seized as a result of that search. After an evidentiary hearing in which Penwell and Dan Johnson, a computer forensic examiner working for the sheriff's department, gave testimony, the district court denied Conner's motion. Conner waived his right to counsel after the court denied the suppression motion and represented himself at trial.  A jury found Conner guilty of all five counts in the superseding indictment.

Prior to his sentencing hearing, Conner reasserted his right to counsel. The pre-sentence report prepared for Conner calculated an

offense level of 42, including a two-point enhancement for an offense that "involved . . . [d]istribution" under Sentencing Guideline § 2G2.2(b)(3)(F). Conner objected to this enhancement. He also argued that he should receive a two-level reduction in his base offense level under section 2G2.2(b)(1) of the Guidelines. The district court overruled the objections during Conner's sentencing hearing and sentenced Conner to a within-Guidelines sentence of 360 months in prison—240 months for the visual-depictions counts and 120 months for the possession count, to be served consecutively.

When a defendant appeals the denial of a suppression motion, this court reviews the district court's factual findings for clear error and its legal determinations de novo. *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). Because the government prevailed in the district court, this court must "consider the evidence in the light most favorable to the government." *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008).

Conner asks us to find that he had a "legitimate expectation of privacy" in the images he made available for sharing on LimeWire. In order to do so, we must answer two questions in the affirmative:

First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that "he [sought] to preserve [something] as private." ... Second, we inquire whether the individual's expectation of privacy is "one that society is prepared to recognize as reasonable."

*Bond v. United States*, 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) (alterations in original) (quoting Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). Conner's argument fails because his expectation of privacy is not "one that society is prepared to recognize as reasonable."

Generally speaking, computer users have a reasonable expectation of privacy in data stored on a home computer. *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001). Conner argues that under *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) (*en banc*), third-party access to information on one's computer is consistent with a

19

reasonable expectation of privacy in that information. In *Warshak*, we agreed that the government could not compel a commercial ISP to turn over the contents of a subscriber's e-mails without a warrant because subscribers "enjoy[ ] a reasonable expectation of privacy in the contents of emails," even though an ISP has the ability to view the contents of e-mail prior to delivery. 631 F.3d at 288. In the context of e-mail, ISPs are "the functional equivalent of a post office or a telephone company," and like an ISP, both of these entities have the ability to intrude on the contents of messages in the course of delivering them to their intended recipients. *Id*. at 286. Since the right or ability of third parties to intrude on phone calls and letters has not been deemed sufficient to defeat a reasonable expectation of privacy in those modes of communication, we agreed that "it would defy common sense to afford emails lesser Fourth Amendment protection" than telephone calls or letters. *Id*. at 285–86.

*Warshak* does not control this case because peer-to-peer file sharing is different in kind from e-mail, letters, and telephone calls. Unlike these forms of communication, in which third parties have incidental access to the content of messages, computer programs like LimeWire are expressly designed to make files on a computer available for download by the public, including law enforcement. Peer-to-peer software users are not mere intermediaries, but the intended recipients of these files. Public exposure of information in this manner defeats an objectively reasonable expectation of privacy under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); see also California v. Greenwood, 486 U.S. 35, 40–41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (finding no reasonable expectation of privacy in "plastic garbage bags left on or at the side of a public street," which are accessible by "members of the public" and left on the curb "for the express purpose of conveying [them] to a third party, the trash collector").

Conner responds that he did not know the files he downloaded from LimeWire would be publicly accessible. To prove this point, he emphasizes efforts he made to keep these files private by moving them to compact disks and reinstalling his operating system on the computer to "wipe[ ] the hard drive clean." But these efforts only prove that he was ineffective at keeping the files he downloaded from LimeWire from being detected. They do not establish that he was unaware of a risk of being discovered. As the Ninth Circuit observed when confronted with a similar argument,

Conner's "subjective intention not to share his files d[oes] not create an objectively reasonable expectation of privacy in the face of [the] widespread public access" to his files LimeWire created. *United States v. Borowy*, 595 F.3d 1045, 1048 (9th Cir.2010) (rejecting Fourth Amendment privacy claim of defendant who unsuccessfully attempted to use LimeWire's privacy features "to prevent others from downloading or viewing the names of files on his computer").

Furthermore, Conner's assertions of ignorance are not supported by the record. Penwell downloaded images from Conner's computer twice over a month-long period, meaning that the images were available on Conner's computer for a significant period of time. Conner's sister, Sandra Conner–Lewingdon, testified at trial that Lawwell had shown her and Conner how to use LimeWire to search for music files being shared by other users. The forensic examination of Conner's computer confirmed that he was using LimeWire to download child pornography images from other users and storing those images in files used for sharing over LimeWire. The sheer number of files that were available for download— "hundreds," according to Penwell—belies Conner's purported ignorance in how the software worked. Finally, Conner concedes that while he made an effort to take some files off of his computer, he took no affirmative steps to limit the ability of other LimeWire users to access the files in his folder, despite a reasonably high level of competency with computers. "To argue that [Conner] lacked the technical savvy or good sense to configure LimeWire to prevent access to his pornography files is like saying that he did not know enough to close his drapes," and the district court did not err by rejecting Conner's assertions of ignorance. *United States v. Ganoe*, 538 F.3d 1117, 1127 (9th Cir. 2008).

Sister circuits that have taken up this question uniformly hold that there is no reasonable expectation of privacy in files the government obtained using peer-to-peer sharing services like LimeWire. *United States v. Stults*, 575 F.3d 834, 843 (8th Cir.2009) ("One who gives his house keys to all of his friends who request them should not be surprised should some of them open the door without knocking."); *Ganoe*, 538 F.3d at 1127; *United States v. Perrine*, 518 F.3d 1196, 1205 (10th Cir. 2008). In line with these opinions, we agree that the district court properly declined to suppress the files Penwell downloaded from Conner's computer and the fruits of the investigation that emanated from those files.

*United States v. Connor,* 521 F. App'x 493, 494-98 (6th Cir. 2013).  Petitioner's arguments therefore amount to nothing more than an attempt to re-litigate an issue that has already been determined.  This Court will not address a claim that has already been rejected on appeal.  *See DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) ("A § 2255 petition may not be used to relitigate an issue that was raised on appeal absent highly extraordinary circumstances.")

**Recommended Disposition**

**WHEREUPON**, the Magistrate Judge **RECOMMENDS** that the Motion to Vacate under § 2255 be **DENIED** and this action be **DISMISSED**.

Petitioner's request for an evidentiary hearing and the appointment of counsel are **DENIED.**

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of

the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.


                                                             **s/ Elizabeth A. Preston Deavers**
                                                        **Elizabeth A. Preston Deavers**
                                                        **United States Magistrate Judge**

**Date:  July 20, 2015**